UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **vs.** ) | **CASE NO. 4:13-CR-0394-SLB** |
| ) | |
| **PHILLIP DON SCOTT,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

This case is presently pending before the court on Defendant's First Motion to Suppress. (Doc. 31.)[1] Defendant asks the court to suppress "any and all information, including the fruits thereof, in whatever form, unlawfully obtained pursuant to, or as the result of, the traffic stop which occurred on May 10th, 2013 involving this defendant, including any and all detentions, statement, or searches, . . . which were conducted as a result of information obtained from or gathered during that stop, or any other evidence obtained as a direct or indirect result of that stop." (*Id*. at 1.) For the reasons set forth below, defendant's First Motion to Suppress, (doc. 31), is **DENIED**.

## STATEMENT OF FACTS

The court finds the following facts based upon testimony and exhibits offered at the hearings held on December 16, 2013, and January 15, 2014.

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

On May 10, 2013, Albertville Police Department Captain John Amos stopped a 1969 black Pontiac Firebird on Highway 75 for failing to signal a lane change. Captain Amos testified that defendant, Phillip Don Scott ("Scott"), had failed to signal his lane change when he moved from the left lane of U.S. Highway 431 into the left-turn lane at the intersection of Highway 431 and Highway 75. After turning onto Highway 75, Captain Amos activated his lights and pulled Scott over. Captain Amos approached Scott and told him that he had pulled him over for failure to signal and also told him that he knew he had a suspended license. Scott told Captain Amos that he did not have his driver's license and he gave Captain Amos his personal information including his social security number. Captain Amos returned to his vehicle and attempted to verify Scott's information and the status of his driver's license through the MOVE database.[2]

After a few minutes, while Captain Amos was in his vehicle, he was approached by Albertville Police Department Sergeant Eric Farmer. Sergeant Farmer was assigned to the North Alabama Safe Streets Task Force. Agents of the Task Force had established surveillance on the residence of Scott's co-defendant, Roneice Newman, as part of an investigation into a large-scale methamphetamine distribution operation. Scott, driving the 1969 Firebird, had been seen leaving Ms. Newman's residence by agents of the Task Force, who had informed Sergeant Farmer that they believed Scott to be carrying methamphetamine.

---

[2]Captain Amos testified that MOVE stands for "Mobile Officer Virtual Environment," and is a state database that is used to run licenses and issue traffic tickets.

Agents had run the license plate of the 1969 Firebird and found the car was registered to Phillip and Laura Scott; further, they determined that Scott's driver's license was suspended. An agent of the Task Force had requested Captain Amos to stop Scott if he observed any violation.

Captain Amos continued to attempt to log in to the MOVE database through the computer in his car. However, he was unable to connect to MOVE, and, after several minutes, he sent an instant-message to the dispatcher. She ran Scott's driver's license and sent the results back to Captain Amos. The dispatcher confirmed that the personal information Scott had supplied came back with a suspended driver's license. At this point, the video of the traffic stop indicates the stop had lasted 14 minutes and 19 seconds.

Captain Amos and Sergeant Farmer discussed whether Captain Amos should call a wrecker to tow Scott's car. Under normal circumstances, Captain Amos would impound the vehicle because Scott was driving with a suspended license. However, Sergeant Farmer suggested that they get Scott out of his car and ask him for consent to search the car for drugs. If they found drugs, Sergeant Farmer would ask Scott to cooperate and they would not tow his car. If they did not find any drugs or if Scott did not agree to cooperate, Sergeant Farmer stated that then they could impound the car. Captain Amos testified that he decided to ask Scott to get out of his car and that they would talk to him while Captain Amos wrote the warning ticket.

Captain Amos and Sergeant Farmer approached Scott 16 minutes and 16 seconds after the video of the stop began. Captain Amos asked Scott to exit the car, and he told Scott that his driver's license was suspended. When Scott got out of the car, Captain Amos asked him if he could "check him," to which Scott consented. Then, Captain Amos asked Scott if he had any weapons on him and Scott told him that he had a fishing bobber in the front right pocket of his jeans. He agreed to let Captain Amos retrieve the bobber and Captain Amos reached into Scott's pocket. The video reveals that a few seconds before reaching into Scott's pocket, Captain Amos's hand is flat against Scott's hip; he has nothing in his hand.[3]

Captain Amos found the bobber and a small, plastic bag containing a white crystal substance in Scott's pocket. Later testing revealed that this substance was methamphetamine. When Captain Amos pulled out the bag, Scott acted surprised.

At this point, Sergeant Farmer told Scott that he worked narcotics and asked Scott if he wanted to "help himself." Scott responded that he wanted to cooperate. He was not handcuffed and neither Captain Amos nor Sergeant Farmer ever drew their weapons. Scott consented to Sergeant Farmer searching his car and, in fact, told him that he had drugs under the front seat. Sergeant Farmer gave Scott a telephone number and told him to call after he left the traffic stop and then Sergeant Farmer left.

---

[3]Unfortunately, Sergeant Farmer stepped in front of the car, blocking the view from the dash cam, immediately before Captain Amos reached in Scott's pocket.

At this point, Scott accompanied Captain Amos to his patrol car and Captain Amos gave him a warning ticket for failing to signal his lane change and driving with a suspended license. Neither Captain Amos nor Sergeant Farmer ever told Scott he was under arrest. After receiving the warning ticket, Scott returned to his car and called Sergeant Farmer.

Scott agreed to meet Sergeant Farmer in the parking lot of the Boaz Wal-Mart. He went to the agreed location and once there, he agreed to go with Sergeant Farmer to talk to the FBI. He met with FBI Special Agent Jack Shiner in Boaz at a building next door to the Boaz Police Department. During this meeting, S.A. Shiner and Sergeant Farmer repeatedly told Scott he was *not* under arrest. At one point during the meeting, Sergeant Farmer told Special Agent Shiner that Scott was not going to tell them what they needed to know and so they should take Scott to Albertville and book him. Scott testified that, at this point, he asked them to "wait a minute" and to "give [him] a shot," because he "wanted to help [himself]" and he "didn't want to go to jail." He testified that he believed he had to cooperate or he would be arrested. During this meeting, Scott told S.A. Shiner that the drugs in his pocket and in his car came from Ms. Newman.

This meeting lasted about four hours, after which Scott was taken home. He was released with the understanding that he would cooperate with the Task Force.

## DISCUSSION

**A. PROBABLE CAUSE TO STOP**

Scott contends that Captain Amos did not have probable cause to make a traffic stop. (Doc. 31 at 6.) He contends that the traffic stop was a "pretext to investigate his potential involvement with the suspected drug activity at co-defendant [Roneice Newman's] house." (*Id.*)

> A traffic stop constitutes an unreasonable seizure if it is not supported by reasonable suspicion or probable cause. [*Whren v. United States*, 517 U.S. 806, 810 (1996)]; *United States v. Chanthasouxat*, 342 F.3d 1271, 1275 (11th Cir. 2003). But a traffic stop is reasonable under the Fourth Amendment when supported by probable cause or reasonable suspicion . . . . Probable cause requires that "the facts and circumstances within [an officer's] knowledge and of which [the officer] ha[s] reasonably trustworthy information [be] sufficient to warrant a prudent man in believing" that the person seized is guilty of a crime. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Reasonable suspicion requires "some minimal level of objective justification," meaning "something more than an inchoate and unparticularized suspicion or hunch," that the person seized is guilty of a crime. *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation marks omitted). If the scope of the traffic stop exceeds that of "an investigative stop of limited duration," it constitutes an unreasonable seizure unless it is supported by probable cause. *United States v. Acosta*, 363 F.3d 1141, 1145-46 (11th Cir. 2004).

*United States v. House*, 684 F.3d 1173, 1199 (11th Cir. 2012)(parallel Supreme Court citations omitted). The "actual motivations of the individual officers involved" is not relevant to the determination of "the constitutional reasonableness of [a] traffic stop[ ]," because "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren*, 517 U.S. at 813.

6

Captain Amos testified that he had observed Scott move from the left lane of Highway 431 into the turn lane before turning left onto Highway 75 and that Scott had not activated his turn signal until he was moving into the turn lane. Scott testified that he turned on his left turn signal before he got into the turn lane. However, he also testified that he got into the turn lane "just past" the turn lane to go into the Burger King and he turned on his turn signal "immediately" after he passed the Burger King intersection, a distance of a few feet.[4] The court finds that Scott's testimony is consistent with Captain Amos's testimony that he observed Scott signaling his lane change at essentially the same time as he moved into the turn lane.

Alabama law provides, "No person shall turn a vehicle or move right or left upon a roadway unless and until such movement can be made with reasonable safety nor without giving an appropriate signal in the manner hereinafter provided;" the manner of "giving an appropriate signal" is described as giving a signal "continuously during not less than the last 100 feet traveled by the vehicle before turning." Ala. Code § 32-5A-133(a) and (b). Based on the court's finding that Scott activated his turn signal at the same time he began to move into the turn lane, the court finds Captain Amos had probable cause to stop Scott for failing to signal his move into the turn lane in accordance with Alabama law.

---

[4] In his Motion to Suppress, Scott contends, "It should be noted that testimony established that the left turn lane at issue in the supposed violation that led to the stop was mere feet in front of a prior left turn lane, so that defendant was arguably in an impossible traffic situation in which any turn signal would have either been too early or too late." (Doc. 45 at 2.)

7

Defendant's Motion to Suppress based on a lack of probable cause to make a traffic stop is **DENIED**.

## B.  REMOVING SCOTT FROM HIS CAR

Scott argues that Captain Amos should have arrested him at the time he was asked to step out of his car.  He contends had he been arrested he would have received a *Miranda* warnings and his car would have been off limits to a search. (Doc. 31 at 7.)  He contends:

> While it should be clear that the only justification for getting Scott out of his car at the point the officers do is to effect an arrest, as no investigation was needed at the time on the license charge,[5] he is not told he is under arrest. Instead, he is asked for consent to search his pockets.  Again, such consent would have been unnecessary incident to an arrest, but placing Scott under arrest would have invoked rights that the police wanted to avoid.  Instead they asked for permission to search his pockets, and that permission was granted by Scott.

(*Id*. [footnote added].)

The law is long and well established that Scott had "no constitutional right to be arrested." *Hoffa v. United States*, 385 U.S. 293, 310 (1966).

> The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long.  Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.

---

[5]Scott contends that Captain Amos had probable cause to arrest him only for the offense of driving with a suspended license.  (Doc. 31 at 7.)

*Id*. "Because there is no constitutional right to be arrested, a suspect cannot complain that officers postponed arresting him in order to obtain more incriminating statements or other evidence against him." *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006)(citing, *inter alia*, *Hoffa*, 385 U.S. at 310)

Therefore, Scott's Motion to Suppress based on his argument that he should have been arrested is **DENIED**.[6]

## C. PLANTING DRUGS

Scott contends that Captain Amos planted the drugs allegedly found in his pocket. He argues:

> In this case, there is no question that Scott consented to searches, made admissions, and took all manner of other incriminating actions after the police claimed to have found illegal drugs on his person. In seeking to suppress all such incriminating information, Scott contends that the illegal activity by the police in planting the drugs on his person, or producing them as if they had been found on his person, leads to the necessity to suppress all subsequent voluntarily provided evidence.

(Doc. 31 at 5-6.)

The court finds, as a matter of fact, that Captain Amos did not place any drugs into Scott's pocket or otherwise plant drugs on Scott. The court fully credits the testimony of Captain Amos that he found the bag of methamphetamine in Scott's pocket.

---

[6]The court notes that this argument, that Scott should have been arrested, is different from his argument that he was "in custody," discussed *infra*.

Therefore, Scott's Motion to Suppress based on his assertion that drugs were planted on his person is **DENIED**.

## D.  IMPROPER DELAY

Scott argues:

> Once the stop had been made, Captain Amos impermissibly lengthened the stop in order to allow a member of the drug task force, Sergeant Farmer, to arrive and orchestrate the process of the stop in accordance with the goals of finding narcotics and procuring the defendant's cooperation.  While defendant acknowledges that the length of time of the stop alone does not rise to the level required of the 11th Circuit to make the stop per se unreasonable, the defendant does maintain that the manner in which the stop was delayed was impermissible.

(Doc. 45 at 3.)  Specifically he argues that "Captain Amos admits to Sergeant Farmer that he had waited to perform certain tasks related to the traffic stop, such as calling in the license information, until after Sergeant Farmer's arrival." (*Id*.)

The video of the traffic stop shows that slightly more than three minutes passed between the time Captain Amos returned to his patrol car after initially speaking with Scott and the time Sergeant Farmer arrived.  Captain Amos testified that he tried to input Scott's information into the MOVE system.  He testified he was unable to log in to the system, however, and he eventually sent the information to the dispatcher via instant-messaging.

Captain Amos received the requested information regarding Scott's driver's license less than 15 minutes after the stop began.  At this time, Captain Amos and Sergeant Farmer discuss calling a wrecker to tow Scott's car.  A minute or two later Captain Amos and Sergeant Farmer approach Scott and ask him to step out of the car.  Captain Amos asks Scott

if he can check him and Scott agrees. At this point, the warning ticket has not been issued; the traffic stop is not over.

The court finds that the traffic stop was not unreasonably prolonged by either Captain Amos waiting for Sergeant Farmer or the discussion between Captain Amos and Sergeant Farmer about whether to impound Scott's vehicle. Scott consents to the search of his person and the search of vehicle before he receives the warning ticket. The total time between the beginning of the video of the stop and its end is less than 30 minutes. However, the time between Captain Amos's return to his vehicle with Scott's information and the time he receives confirmation that Scott's license is suspended is less than 15 minutes; he approaches Scott the second time about 2 minutes later.

"[T]he duration of the traffic stop 'must be limited to the time necessary to effectuate the purpose of the stop.'" *United States v. Ramirez*, 476 F.3d 1231, 1236 (11th Cir. 2007)(quoting *Purcell*, 236 F.3d at 1277.) "Traffic stops, even for minor violations, can take upwards of 30 minutes." *Maryland v. Wilson*, 519 U.S. 408, 422 (1997)(Kennedy, J., dissenting). In determining whether the stop was limited to the time necessary to fulfill the purpose of the stop, the court "look[s] only at the duration of the seizure given all the circumstances: was it for an unreasonable time?" *United States v. Hernandez*, 418 F.3d 1206, 1209 (11th Cir. 2005). "The officer may . . . prolong the detention to investigate the driver's license and the vehicle registration and may do so by requesting a computer check." *United States v. Purcell*, 236 F.3d 1274, 1278 (11th Cir. 2001)(internal citations omitted).

"Ordinarily, when a citation or warning has been issued and all record checks have been completed and come back clean, the legitimate investigative purpose of the traffic stop is fulfilled, and the driver's license and other documents should be returned." *United States v. Simms*, 385 F.3d 1347, 1353 (11th Cir. 2004).

In this case, the results of the record check of Scott's driver's license did not come back "clean," and the warning ticket was not issued until after Scott had given his consent to Captain Amos to check him for weapons and for Sergeant Farmer to check his car for drugs. Therefore, at the time the drugs were found on Scott and in his car the traffic stop was not over. Moreover, the court finds that the traffic stop was not prolonged past the time necessary to effectuate the purpose of the stop.

Therefore, defendant's Motion to Suppress based on his claim that the traffic stop was impermissibly prolonged is **DENIED**.

## E.  FAILURE TO GIVE *MIRANDA* WARNINGS

Scott contends that he was in custody "once the drugs were produced from his pocket;" therefore, his statements made thereafter, including his consent to Sergeant Farmer's search of his car, are due to be suppressed because he was not given the *Miranda* warnings[7] before questioning. (Doc. 45 at 4-5.) He states:

---

[7]"In *Miranda v. Arizona*, the Court determined that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney." *Edwards v. Arizona*, 451 U.S. 477, 481-82 (1981)(citing *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)).

> In this instance, no individual, innocent or otherwise, would have thought they were free to leave, either the scene at the traffic stop with Sergeant Farmer or the room in which the defendant was questioned for several hours and threatened by Sergeant Farmer with immediate jail if he did not give the answers sought. The totality of the circumstances strongly argue that any reasonable person would believe they were 'in custody' unless an until the law enforcement officers instructed them they could leave, and thus all statements made by the defendant while effectively in custody and without having been read his rights are due to be suppressed. Further, defendant would argue that the discovery of the drugs inside his car would not necessarily have been made absent his un-[M]irandized statements and moves to suppress those drugs accordingly.

(*Id*. at 4-5.)

The Government contends that *Miranda* warnings are not required before routine questioning during a traffic stop, and this stop was "consistent with a routine traffic stop." (Doc. 38 at 11-12.) Also, it argues that *Miranda* warnings were not necessary before questioning by S.A. Shiner because Scott was not in custody. (*Id*. at 12.)

The court finds the following facts: Following Captain Amos finding the methamphetamine in Scott's pocket, Sergeant Farmer asked Scott if was willing to cooperate; Scott responded that he wanted to cooperate. He was not handcuffed and neither Captain Amos nor Sergeant Farmer ever drew their weapons. Scott consented to Sergeant Farmer searching his car and, in fact, told him that he had drugs under the front seat. Sergeant Farmer gave Scott a telephone number and told him to call after he left the traffic stop. At this point, Scott accompanied Captain Amos to his patrol car and Captain Amos gave him a warning ticket. Neither Captain Amos nor Sergeant Farmer told Scott he was under arrest.

13

After receiving the warning ticket, Scott called Sergeant Farmer and he agreed to meet Sergeant Farmer at the Boaz Wal-Mart parking lot. He went to the agreed location and once there, he agreed to go with Sergeant Farmer to talk to the FBI. Special Agent Shiner and Sergeant Farmer told Scott he was *not* under arrest. At one point during the meeting, Sergeant Farmer told Special Agent Shiner that Scott was not going to tell them what they needed to know and so they should take Scott to Albertville and book him. Scott testified that, at this point, he asked them to "wait a minute" and give [him] a shot," because he "wanted to help [himself]" and he "didn't want to go to jail." He testified that he believed he had to cooperate or he would be arrested.

The right to *Miranda* warnings attaches when custodial interrogation begins. *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004). "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving of *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983)(quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).

> Whether [a defendant] was in custody prior to his formal arrest "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." [*United States v.*] *McDowell*, 250 F.3d [1354,] 1362 [(11th Cir. 2001)] (quotation marks and alterations omitted). "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996). "[U]nder the

> objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable *innocent* person." *Id*. (emphasis added).

*United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006).

Generally, a person "temporarily detained pursuant to [a traffic stop is] not 'in custody' for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). Also, a defendant's statement "that he did not want to go to jail is indicative of not being in custody up to that point." *U.S. v. Sroufe*, Criminal Action No. 1:11-CR-311-CAP/AJB, 2012 WL 4325825, *7 (N.D. Ga. July 16, 2012). "Objectively a suspect cannot be deemed to be 'in custody' when the person states, after questioning by the police, that he does not want to go to jail, since a person in custody would not believe that he had that option left to him." *Id*.

Based on the evidence the court finds that Scott was not "in custody" at any time on May 10, 2013, and, therefore, *Miranda* warnings were not required. Therefore, Scott's Motion to Suppress based on a lack of *Miranda* warnings is **DENIED**.

## CONCLUSION

Based on the foregoing, defendant's Motion to Suppress is **DENIED**. The government may introduce evidence of methamphetamine recovered from Scott and his statements to law enforcement officers made on May 10, 2013.

**DONE** this 11th day of March, 2014.

*/s/ Sharon Lovelace Blackburn*
_____
SHARON LOVELACE BLACKBURN
UNITED STATES DISTRICT JUDGE