## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 4:13-CR-394-SLB** |
| | ) | |
| **PHILLIP DON SCOTT** | ) | |

## MEMORANDUM OPINION

This case is before the court on the Government's Amended Motion for Mistrial, (doc. 64),[1] and defendant's objections to it, (*see* doc. 66 & 67). The court will also address the potential barriers to reprosecution.[2] For the reasons stated below, the court will declare a mistrial and sees no bar to reprosecution in this case.

## FACTS

The jury panel from which this jury was selected had originally been called to report for service on May 5, 2014, for a two-week term of court. Their reporting date was continued to May 12, 2014, then to May 13, 2014. The jury was sworn and seated before the lunch recess, during which defendant, complaining of dizziness, went to the emergency room. He spent the next several hours undergoing testing and treatment for extremely high blood pressure. The jury was directed to return at 10:00 a.m. the following morning, May 14, 2014. At 9:00 a.m. that morning, the court had the defendant submit to drug testing by his probation

---

[1] Reference to a document number, ("Doc. ___"), references to the number assigned each document as it is filed in the court's record.

[2] Any motion to dismiss the indictment in this case, although it should be made, will almost certainly be denied by a simple citation to this Memorandum Opinion.

officer, and defendant tested positive for methamphetamine.[3] (Doc. 71, Excerpt of Transcript of Trial on May 14, 2014 at 3.) When asked by the court how he felt, defendant stated that he felt "kind of clammy and sweaty." (*Id*. at 6.) Defendant was remanded to the custody of the United States Marshal and taken to the Calhoun County Jail. After examination, the nurse at the jail advised that defendant's blood pressure was 183 over 115, that the nurse felt defendant was impaired, and it would take four to five days for him to detox. (*Id*. at 8.) The court then continued the trial to May 27, 2014. At that time one of the selected jurors indicated that it would be an extreme hardship for him to return at that time, as he was self-employed and had lost significant earnings due to the repeated extensions of the jury term date. The juror had been "very upset and did not have a good attitude about continuing to serve." (Doc. 72, June 12, 2014 Transcript at 26:15-19.) The court excused him. While the remaining twelve jurors indicated they could return on May 27th, there was some degree of frustration noted as to the extensions of their service.

At the time the jury was originally seated, the government's first witness, a Drug Enforcement Agency toxicologist who had tested the alleged controlled substances in this case, was at the courthouse ready to testify. However, on May 22, 2014, the toxicologist informed the Assistant United States Attorney that her physician had determined that her pregnancy with twins was "high risk" and she was no longer able to travel from her home in

---

[3]Defendant contended that this was a false positive resulting from use of over-the-counter medication, but defendant was asked several times at the hospital whether he had taken any kind of medication and he repeatedly denied it.

Texas to Alabama to testify. As a result, the alleged controlled substances would need to be resubmitted to the DEA laboratory in Dallas, Texas, for testing by another toxicologist who would then be able to travel to Alabama to testify at trial. This process would take approximately two weeks.

On May 23, 2014, the jury was advised that they should not report on May 27, 2014, that the case had been postponed and a new date had not yet been determined. The government moved for a mistrial so that it could have another expert retest the alleged controlled substances at issue in this case and testify as to the results. (Doc. 64.) The court was initially inclined to continue the trial instead. (*See* doc. 72, June 12, 2014 Transcript at 5:3-11.)

The court asked its Jury Administrator to call the jurors to see the first date they were all available. One juror had a prepaid out-of-state vacation set for June 16, one for June 23. (Doc. 72, June 12, 2014 Transcript at 3; doc. 68-1.) One Juror had a family reunion to attend, another had an out-of-town baseball tournament for her child on June 30. (*Id*.) The court was unavailable the week of July 7. (Doc. 72, June 12, 2014 Transcript at 7.) One juror was unavailable the week of July 14. (*Id*.) One juror had a prepaid out-of-state vacation from July 19-30. (Doc. 68-1.) In the end "there[ was] not a date that all 12 jurors [were] available." (Doc. 72, June 12, 2014 Transcript at 30:16-18). One juror was moving to Atlanta, Georgia, the week of July 28, to begin graduate school. (*Id*. at 23:4-5). The only way defendant could be tried by members of the original jury, other than by haling at least one juror into court long

3

after the juror's original term of service had expired and causing him or her hardship, was for the defendant to consent to a trial by eleven. Defendant and his attorney discussed this possibility, and the court gave defendant a few additional days to consult his family. (*Id.* at 33.) The court specifically advised defendant that if he did not consent, the court would declare a mistrial and the question of double jeopardy would arise, but that the court would deny a motion to dismiss the indictment. (*Id.* at 31-32.)

As was his right, defendant did not consent to trial by eleven. (Doc. 67.)

## ANALYSIS

The Fifth Amendment's prohibition against any person "being twice put in jeopardy of life or limb" for the same offense "represents a fundamental ideal in our constitutional heritage." *Benton v. Maryland*, 395 U.S. 784, 794 (1969). To that end, once a jury is empaneled and sworn and then a mistrial declared without the defendant's consent, *see United States v. Dinitz*, 424 U.S. 600, 607-610 (1976), the defendant ordinarily may not be retried for the same offense unless, "for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice [could not have] be[en] attained without discontinuing the trial," *Gori v. United States*, 367 U.S. 364, 368 (1961). This determination has been summed up as a finding of "manifest necessity." *See, e.g., Illinois v. Somerville*, 410 U.S. 458, 462-63 (1973). Although "it is impossible to define all the circumstances" that would qualify, *United States v. Perez*, 9 Wheat. 579, 580 (1824), some common ones are well-established: mistrials resulting from a hung jury, *id.*, a

4

severance and mistrial declared after a "defendant exercises his privilege against self-incrimination and a co-defendant's attorney will make prejudicial comments about his privileged silence," *United States v. Aguiar*, 610 F.2d 1296, 1301 (5th Cir. 1980), or an error "mak[ing] reversal on appeal a certainty" and thus continuation a useless formality, *Somerville*, 410 U.S. at 464. Also well-established are some insufficient circumstances: those promoting mere convenience or judicial economy, *United States v. Butler*, 41 F.3d 1435, 1441 (11th Cir. 1995); *United States v. Chica*, 14 F.3d 1527, 1532-33 (11th Cir. 1994), or when no consideration was given to a legitimate possibility of providing a continuance instead of abruptly declaring a mistrial, *United States v. Jorn*, 400 U.S. 470, 487 (1971).

This case presents two questions: (1) whether by declining to stipulate to a jury of eleven, a defendant may, in some cases, be presumed to consent to a declaration of mistrial, eliminating the Double Jeopardy concern consistent with *Dinitz*, 424 U.S. at 608-609; if not, (2) whether manifest necessity to declare a mistrial exists.

In *United States v. Davis*, 708 F.3d 1216 (11th Cir. 2013), after a twelve-member, no-alternate jury was empaneled and sworn, two jurors informed the court that they might not be able to serve: one because she was an hourly employee who estimated that she would lose $1,000 to jury duty, one because she could not understand English very well. *Id.* at 1218-19. The court excused the jurors, Davis did not consent to trial by ten or suggest swearing in

additional jurors,[4] and the court declared a mistrial. *Id.* at 1220. The court of appeals noted that "the removal of the jurors alone did not cause the mistrial" because Davis could have consented to a smaller jury. *Id.* at 1222. Nevertheless, the court "indulg[ed] Davis' premise that his insistence on a jury of twelve does not matter," leaving the first question in this case—whether this insistence does matter—open. This court holds that by exercising his right to a jury of twelve persons, under the facts of this particular case, defendant is deemed to have elected to terminate the first trial, thereby forfeiting any Double Jeopardy objection to retrial. Stated differently, the court deems defendant to have waived the right to object to reprosecution.

### 1. Explicit Objection, Implicit Consent to Mistrial

Defendant explicitly objected to a declaration of mistrial here. (*See* doc. 66.) *Dinitz* held that, with one exception,[5] "mistrials granted at the defendant's request or with his consent" do not give rise to a Double Jeopardy problem. 424 U.S. at 608-09. Allowing reprosecution after a defendant's successful motion for mistrial is itself a logical product of "deem[ing]" the defendant to have waived the right to object to reprosecution (except when the government intentionally "'goad[s] the [defendant] into requesting a mistrial'"). *Kennedy* 456 U.S. at 673 (quoting *Dinitz*, 424 U.S. at 611; *see also United States v. Miller*, 742 F.2d

---

[4]The court believes that attempting to replace any excused jurors by recalling members of the original venire, a route not suggested by either party, is not a workable possibility in this case.

[5]"The Double Jeopardy Clause does protect a defendant against governmental actions intended to provoke mistrial requests . . . ." 424 U.S. at 611.

1279, 1284 (11th Cir. 1984) ("If a mistrial is declared with the defendant's consent, he is deemed to have waived any double jeopardy claim he might otherwise have."). In *Dinitz*, when the trial judge banned one of defendant's attorneys from the courtroom during trial after the attorney made inappropriate comments and defendant moved for mistrial, reprosecution did not violate the Double Jeopardy clause even if defendant seemingly had a "'Hobson's choice'[6] between giving up his first jury and continuing a trial tainted by prejudicial judicial or prosecutorial error." 424 U.S. at 609. And in *Kennedy*, when a prosecutor asked an inappropriate, prejudicial question of a witness even after the court had sustained earlier objections by the defendant related to the line of questioning, the defendant's motion for mistrial—what the court called an "elect[ion] to terminate the proceedings," 456 U.S. at 672—was still consent to retrial absent prosecutorial or judicial conduct "intended to provoke the defendant into moving for a mistrial." *Id.* at 679. Mere "prosecutorial or judicial overreaching" did not negate that consent, *see id.* at 678-79, nor did the fact that defendant faced a "Hobson's choice—either to accept a necessarily prejudiced jury, or to move for a mistrial and face the process of being retried at a later time," *id.* at 670 (quoting the Oregon Court of Appeal's decision).

---

[6]For a definition of a "Hobson's Choice", see *N.L.R.B. v. CER Inc*., 762 F.2d 482, 486 n.7 (5th Cir. 1985)("The Random House Dictionary of the English Language 675 (unabridged ed. 1969) defines Hobson's choice as 'the choice of taking either that which is offered or nothing; the absence of a real choice or alternative [after Thomas Hobson (1544-1631), of Cambridge, England, who rented horses and gave his customer only one choice, that of the horse nearest the stable door].'").

*United States v. Larouche Campaign*, 866 F.2d 512 (1st Cir. 1989), is a closer case. There, the defendants asked the trial court to excuse five of the jurors for hardship and the court did so, leaving only ten jurors, but the defendants then declined to stipulate to trial by ten and the court declared a mistrial. *Id.* at 513. In affirming the denial of the defendants' subsequent motion to dismiss their indictments, the First Circuit, speaking through then-Judge Breyer, recognized that "[t]he important consideration . . . is that the defendant retain *primary control* over the course to be followed," *id.* at 514-515 (quoting *Dinitz*, 424 U.S. at 609) (emphasis added in *Larouche Campaign*), and held that "the Double Jeopardy Clause could pose no greater bar to retrying a defendant who asks to excuse jurors than it poses when a defendant asks for a mistrial directly." *Id.* at 515.

The question is whether this logic can be carried a step further. When faced—for whatever reason, absent actions intended to provoke the defendant to request a mistrial—with a jury of eleven, if a defendant refuses to proceed, can the defendant be deemed to have elected to terminate the first trial, forfeiting any Double Jeopardy objection to retrial? The court believes that logic says yes.

"The important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed . . . ." *Dinitz*, 424 U.S. at 609. Once this court informed defendant and his counsel that no trial date could be set in which the court would not excuse at least one of the remaining twelve jurors from service, (*see* doc. 72, June 12, 2014 Transcript at 30-31), defendant had his *Dinitz* choice: stipulate to a jury

of eleven "and, perhaps, end the dispute then and there with an acquittal," *id.* at 608 (quoting *Jorn*, 400 U.S. at 484), or hold fast to his Rule 23(b) right to insist on a jury of twelve and force a mistrial. Defendant retained "primary control" over the direction of the trial from that point on—in fact, the court gave defendant a few days to talk with his family about what course he should take. (*See* doc. 72, June 14, 2014 Transcript at 33.) When this court accommodated the jurors' schedules after the initial court session for which they were called had expired, it did not do so "intend[ing] to provoke the defendant into moving for a mistrial," *see Kennedy*, 456 U.S. at 679, or even intending for the circumstances to lead to a mistrial, much less "by judicial . . . impropriety designed to avoid an acquittal," *id.* at 678-679 (quoting *Jorn*, 400 U.S. at 485 n.12). Indeed, the court repeatedly reminded defendant that he could avoid mistrial by consenting to trial by eleven of the original twelve jurors. Why certain jurors were accommodated had nothing to do with their potential biases in the case; it was only a result of the juror's particular hardship after their initial term of service was over. And even if the Supreme Court had found compelling the Oregon Court of Appeal's concern that consent was not real when defendant faced a "Hobson's choice," which the Court did not, this was no Hobson's choice: proceeding with less than twelve would not have been "to accept a necessarily prejudiced jury," *see Kennedy*, 456 U.S. at 670. Twelve is a historic number, maybe even a mystical number, as the Court once speculated, but it is not a constitutionally- or even a pragmatically-required number. *See Williams v.*

9

*Florida*, 399 U.S. 78, 86-88 (1970); Fed. R. Crim. P. 23(b) advisory committee's note. Defendant would not be prejudiced by trial by eleven.[7]

Since the defendant at all times retained the option to proceed with a jury of eleven, he retained one of the interests the Double Jeopardy clause affords him: his interest in "having the trial concluded in a single proceeding," which minimizes the "financial and emotional burden on the accused" and the "period in which he is stigmatized by an unresolved accusation of wrongdoing." *Arizona v. Washington*, 434 U.S. 497, 504-505 (1978). Due in part to his refusal to stipulate to trial by eleven, however, this interest has unfortunately fallen by the wayside.

In sum, defendant was not damned if he did, damned if he didn't; he had a strategic choice to make, one even easier than the one faced by the defendants in *Miller*, *Dinitz*, and *Kennedy*, since defendant can claim no prejudice by (or constitutional protection from) trial by eleven. That he chose to insist on twelve is his Fed. R. Civ. P 23(b) right, but the product of exercising that right in the circumstances presented to him is a mistrial, and he cannot now call upon the Double Jeopardy clause to save him from his choice.[8]

---

[7]Trial by twelve is not something that a defendant can insist upon at all times. Once the jury has begun deliberations, the court may excuse a juror and permit the remaining eleven to return a verdict even over the defendant's objection. *See* Fed. R. Crim. P. 23(b)(3). This fact shatters any claim that making a defendant choose between trial by the remaining original jurors or mistrial and retrial by a new twelve-member jury is somehow so unfair a dilemma as to not really be a waiver of a Double Jeopardy objection if defendant chooses to insist upon trial by twelve and cause a mistrial.

[8]At the risk of making something of nothing, the court notes one assumption made by the holding of waiver in this case. In other cases finding waiver of Double Jeopardy

**2. Manifest Necessity**

After the jury was empaneled in this case, defendant became incapacitated. He was determined to be incapable of proceeding for a period of four to five days, which necessitated a continuance of his trial. His jury was informed to return two weeks later to resume the trial. However, before the date set for the continuation of the proceeding, the Government's witness was determined to be unable to travel due to complications in her pregnancy. This witness was present and available to testify on May 14, 2014, before defendant's illness required a continuance.

---

protection, the opportunity remained for the defendant to exercise a "valued right to have his guilt or innocence determined before the first trier of fact," *United States v. Scott*, 437 U.S. 82, 93 (1978), or "before the jury first empaneled to try him," *id.* at 96; *see Kennedy*, 456 U.S. at 673; *Dinitz*, 424 U.S. at 608 ("first jury"); *Jorn*, 400 U.S. at 485 ("a particular tribunal"), even where that jury was potentially tainted. Finding waiver here assumes that defendant has retained that "valued right." In other words, finding waiver here assumes that a defendant still has the crucial decision-making power, the "primary control" over the case's direction held necessary in *Dinitz*, 424 U.S. at 609, when the defendant can proceed to a verdict given by eleven of the original twelve jurors, even if it will not be a verdict given by the exact, twelve-member "jury first empaneled to try him." *Cf. Williams*, 399 U.S. at 86-88 (twelve is not special); Fed. R. Crim. P. 23(b)(3) (giving court power to allow a "jury of 11 persons to return a verdict" after excusing a juror during deliberations); *United States v. Blankenship*, 382 F.3d 1110, 1119 n.20 (11th Cir. 2004) (noting that the Double Jeopardy Clause gives defendants "the constitutional right to have a verdict from the specific jury actually hearing their case (with due allowances made for alternates and the like).").

The text of the Double Jeopardy Clause simply provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. It would be strange indeed if that Clause reached so far into the minutiae of the composition of the jury, when the Sixth Amendment, specifically providing for jury trials, did not.

Before deciding to declare a mistrial, this court considered continuing the trial to some other date on which the jury members were available.  However, based on information from the Jury Administrator, the court determined that all twelve jurors were not available on any subsequent date.  A number of weeks eleven of the twelve original jurors were available; however, as stated above, Mr. Scott did not waive his right to trial by twelve jurors.

The Supreme Court has noted that "a criminal trial is, even in the best of circumstances, a complicated affair to manage.  The proceedings are dependent in the first instance on the elementary sort of considerations,  e.g., the health of the various witnesses, parties, attorneys, jurors, etc., all of whom must be prepared to arrive at the courthouse at set times." *United States v. Jorn*, 400 U.S. 470, 479-80 (1971).  This "complicated affair" began to break down when Mr. Scott went to the emergency room suffering from symptoms that prohibited his participation in the trial.  Obviously, Mr. Scott's physical condition required a continuance. *See United States ex rel. Gibson v. Ziegele*, 479 F.2d 773, 777 (3d Cir. 1973)(illness of prosecution witness); *Loux v. United States*, 389 F.2d 911, 921 (9th Cir. 1968)(defendant injured in fall on courthouse steps).  The court reset the trial for May 27, 2014.  However, during the interim the DEA toxicologist, a necessary witness for the Government, was given a travel ban by her physician.  This witness had been in the courthouse and ready to testify at the time the defendant tested positive for methamphetamine and was deemed unable to participate in the trial. Due to these unexpected events, and due

to juror unavailability following them,[9] the court finds that a mistrial in this case is a manifest necessity.

## CONCLUSION

In the sometimes zero-sum game of balancing a defendant's "valued right to have his trial completed by a particular tribunal," *Washington*, 434 U.S. at 503, with the "countervailing interest of proper judicial administration," *see Somerville*, 410 U.S. at 471, in perhaps not so "very plain and obvious cases," *Perez*, 9 Wheat. at 580, it is important to remember the most basic protection the Double Jeopardy Clause offers, one which has been—and hopefully will always be—a fortress: "If the defendant is acquitted by the jury, or if he is convicted and the conviction is upheld on appeal, he may not be prosecuted again for the same offense," *Kennedy*, 456 U.S. at 682 (Stevens, J., concurring); *see also United*

---

[9]The power to excuse jurors is left to the court's discretion by statute: "any person summoned for jury service may be (1) excused by the court . . . upon a showing of undue hardship or extreme inconvenience, for such period as the court deems necessary . . . ." 28 U.S.C. § 1866(c). And while the statute ultimately leaves it up to the court to decide what constitutes "undue hardship or extreme inconvenience," here are the court's guiding lights:

> "undue hardship or extreme inconvenience," as a basis for excuse from immediate jury service under section 1866(c)(1) of this chapter, shall mean great distance, either in miles or traveltime, from the place of holding court, grave illness in the family or any other emergency which outweighs in immediacy and urgency the obligation to serve as a juror when summoned, *or any other factor which the court determines to constitute an undue hardship or to create an extreme inconvenience to the juror . . . .*

28 U.S.C. § 1869(j) (emphasis added).

13

*States v. Scott,* 437 U.S. 82, 92 (1978) ("[T]he primary purpose of the Double Jeopardy

Clause was to protect the integrity of a final judgment . . . .").[10]

For the reasons stated above, the court finds that a declaration of mistrial is a manifest

necessity in this case and that defendant can be deemed to have waived any objection to

reprosecution.

**DONE** this 22nd day of August, 2014.

*Sharon Lovelace Blackburn*
—————————————————
SHARON LOVELACE BLACKBURN
UNITED STATES DISTRICT JUDGE

---

[10]Declaring a mistrial and allowing retrial with a fresh jury that has not been strung along for weeks is decidedly more benign than one of the "abhorrent practices" that the Clause was penned to condemn: "English judges serv[ing] the Stuart monarchs by exercising a power to discharge a jury whenever it appeared that the Crown's evidence would be insufficient to convict." *Washington*, 434 U.S. at 507.

14